ESTATE OF SHELDON RIPSON, Deceased, DEAN RIPSON and EDNA RIPSON, Co-Executors, and EDNA RIPSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ripson v. Commissioner
Docket No. 10771-77.
United States Tax Court
T.C. Memo 1979-394; 1979 Tax Ct. Memo LEXIS 131; 39 T.C.M. (CCH) 224; T.C.M. (RIA) 79394; September 24, 1979, Filed Alan D. Slattery,Penny Berger,William F. Wright and David *133 A. Ludtke, for the petitioners. J. Anthony Hoefer, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a dificiency in the Federal income tax of the Estate of Sheldon Ripson, deceased, Dean Ripson and Edna Ripson, co-executors, and Edna Ripson, for the taxable year 1974 in the amount of $15,294. The issues for decision are: (1) Whether payments in satisfaction of debts owed by a corporation but guaranteed and paid by its sole shareholder and his wife were contributions to the capital of the corporation; and (2) if those payments were not contributions to capital, but loans to the corporation, whether the amount owed by the corporation to the shareholder and his wife was deductible as a business bad debt in 1974. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Dean Ripson and Edna Ripson, co-executors of the Estate of Sheldon Ripson, both resided in Durant, Iowa, at the time of filing the petition in this case. The Estate of Sheldon Ripson and Edna Ripson filed a joint Federal income tax return for the calendar year 1974 with the Internal Revenue Service Center *134 in Kansas City, Missouri. Sheldon Ripson (hereinafter Mr. Ripson), prior to his death on April 2, 1974, at the age of 69, had been a farmer and cattle feeder since the early 1930's. Mr. Ripson's son, Dean Ripson, began working for Mr. Ripson in the farming and cattle feeding business sometime in 1958 upon leaving the military. Also in 1958, Mr. Ripson purchased his first cattle feeding farm. On or about January 1, 1961, Mr. Ripson and Dean Ripson formed a partnership, Sheldon Ripson & Son (hereinafter the partnership), in which the two partners shared the net profits equally. The partnership raised corn, soybeans, and oats that were fed to partnership cattle and hogs which were raised on the partnership farm. In addition to the home-fed cattle and hogs, the partnership also fed cattle in commercial feedlots some of which were located in other states including Kansas, Oklahoma and Missouri. [1]
Over the years, Mr. Ripson became a well-respected expert in *135 the buying, selling and feeding of cattle. Feeder cattle which weigh between 500 and 900 pounds when purchased, are sold as finished or fat cattle when they weigh between 850 and 1,250 pounds. The cattle are fed between 100 and 150 days, normally 120, before being sold. The cattle kept at commercial feedlots are generally kept 150-head in a pen. Dean Ripson, although he accompanied his father on numerous cattle buying, selling and inspecting trips, was mainly in charge of the home-fed livestock and raising the corn, oats and soybeans fed to them. Edna Ripson, Sheldon's wife and Dean's mother, was not a partner nor a salaried employee of the partnership; however, she did keep the books and acted for Mr. Ripson in his dealings with the Liberty Trust and Savings Bank in Durant, Iowa when Mr. Ripson was absent. She also often accompanied Mr. Ripson on his cattle buying, selling and inspecting trips, which he took at least twice a month. Mr. Ripson spent practically all of his time working at his cattle feeding business. Oftentimes other cattle feeders would contact Mr. Ripson to ask his opinion on buying, selling and feeding cattle. He charged a fee for his consultations on *136 such matters, except in the case of relative newcomers to the business to whom he gave his advice free of charge. In 1970, it was decided to dissolve the partnership. The partnership was dissolved in 1971.In March of 1971, Dean Ripson began renting from his parents the farm property, some 900 acres, formerly used by the partnership for raising grain and feeding cattle; the cattle capacity of this property was 1,200 head. The yearly rental charged Dean Ripson was around $60,000. In March of 1972, the last partnership cattle were sold. [2] Edna Ripson (hereinafter Mrs. Ripson) continued to travel with Mr. Ripson, to keep the cattle operation books, and to deal with the local bank when necessary. *137 In late 1971, the decision to incorporate his sole proprietorship commercial feeding enterprise was made by Mr. Ripson. Among the reasons for his decision to incorporate was his desire to give or leave an interest in his cattle business to his five grandchildren, Dean Ripson's five children, at as small a tax cost as possible. [3] Mr. Ripson had also been advised by his attorney that incorporation could limit his personal liability in the cattle feeding business. On August 28, 1972, the Articles of Incorporation for Ripson Farms, Inc., Sheldon Ripson as Incorporator, were filed with the Secretary of State in Iowa. The Articles of Incorporation authorized the issuance of 2,000,000 shares of stock consisting of three classes: (a) 500,000 shares of preferred nonvoting stock with a par value of $100 per share; (b) 500,000 shares of Class A Common stock with a par value of $1 per share; and (c) 1,000,000 shares of Class B Nonvoting Common stock with a par value of $1 per share.
Ripson Farms, Inc. (hereinafter *138 the corporation) did not become active until January 2, 1973, when Mr. Ripson executed a bill of sale to the corporation for the feeder cattle which he transferred to the corporation in a section 351, I.R.C. 1954, [4] tax-free exchange for stock. The corporation transferred 96,476 shares of stock to Mr. Ripson and he transferred cattle which had cost him $876,705 and which were then subject to $20,976 in cattle feed bills and to $759,253 in notes for loans for the purchase of the cattle, both of which were assumed by the corporation upon transfer. Mr. Ripson became a customer of the Liberty Trust and Savings Bank in Durant, Iowa (hereinafter the Bank), sometime around 1960, when he transferred his account from a bank in a neighboring community because of plans to expand his cattle feeding operations. The Bank had a number of customers who were in the cattle feeding business. From sometime in the early 1970's until his death in 1974, Mr. Ripson was the largest borrower from the Bank in the cattle feeding business. *139 When a cattle feeder borrowed money from the Bank to purchase cattle the Bank took a chattel mortgage on the cattle as security for the loan. Each purchase of cattle would be on a separate note and when the cattle covered by the note were sold four to five months later as finished cattle, the loan from the Bank was paid off out of the proceeds of the sale. Ripson Farms, Inc., was the first corporation engaged in the cattle feeding business with which the Bank had done business. It was the policy of the Bank to require the individual shareholders of any closely held corporation to guarantee all loans to the corporation. This policy was applied to Ripson Farms, Inc., and Mr. Ripson knew prior to its incorporation that he would have to guarantee any corporate debts with the Bank. On September 5, 1972, Mr. Ripson and Mrs. Ripson [5] executed an unsecured personal guarantee of any and all debts the corporation might incur with the Bank. [6]
*140 The corporate debts with the Bank, like the partnership and sole proprietorship debts from Mr. Ripson's cattle feeding operations, arose upon the purchase of feeder cattle. As was its practice with other cattle feeders, the Bank would take a separate note secured with a chattel mortgage on each 150 head (pen) of cattle purchased with the borrowed funds. The Bank would lend Mr. Ripson 100 percent of the purchase price of the feeder cattle on the strength of his financial statements and the faith of the officers of the Bank in his cattle feeding experience. Mr. Ripson would pay the feed yards for the feed of the cattle when the cattle were sold. The Bank also lent the corporation 100 percent of the purchase price of feeder cattle and the cost of feed for the cattle was paid to the feed yards by a corporate check. [7]
Upon commencement of operation of the corporation, the Bank required and received a financial statement of the corporation and of Mr. Ripson, its sole shareholder. The corporation's financial statement *141 was as follows: ASSETS
3/4 of 240 Head of Cattle
Perryton)
3/4 of 181 Head of Cattle
Perryton)
$121,275
93 Head of Cattle
Perryton
34,875
57 Head of Cattle
Perryton)
222 Head of Cattle
Perryton)
83,700
3/4 of 218 Head of Cattle
Perryton
48,900
178 Head of Cattle
Supreme
59,866
214 Head of Cattle
Supreme
88,127
212 Head of Cattle
Supreme
70,204
43 Head of Cattle
Supreme
13,380
192 Head of Cattle
Supreme
67,559
78 Head of Cattle
Supreme
24,819
81 Head of Cattle
Supreme
32,368
80 Head of Cattle
Supreme
30,576
64 Head of Cattle
Supreme
23,751
Other Cattle and Down Payments
185,711
TOTAL ASSETS
$885,111
LIABILITIES
Liberty Trust and Savings Bank - Durant, Iowa
$ 90,900
Liberty Trust and Savings Bank - Durant, Iowa
283,300
Approximate Feed Accounts on Cattle and Other Debts
262,350
TOTAL LIABILITIES
$636,550
Total Assets
$885,111
Total Liabilities
636,550
NET WORTH
$248,561
170,233 shares of stock par value $1 per share to Sheldon E. Ripson and Edna Ripson. Mr. Ripson's financial statement was as follows: ASSETS
170,233 Shares of Ripson Farms, Inc. Stock with
Par Value $1
$248,561
1972 Cash Rent
39,960
27,000 Bushels of Corn
32,400
Estimated Cash Value of Life Insurance
10,000
Cash on Hand
17,500
Total Quick Assets
$348,421
REAL ESTATE: North Farm - Cedar County (148 Acres)
82,500
Home Farm - Cedar County (320 Acres)
220,000
Wilton Farm (Dean) - Muscatine County (140 Acres)
84,000
Wilton Farm (Raynor) - Muscatine County (80 Acres)
40,000
Thede Farm - Cedar County (200 Acres)
110,000
$536,500
TOTAL ASSETS
$884,921
*142 LIABILITIES
Long-term Liabilities on Real Estate: North Farm (148 Acres), Thede Farm (200 Acres)--
Phoenix Mutual
$ 72,000
Liberty Trust and Savings Bank, Mortgage
(80 Acres and 140 Acres)
65,000
Total Indebtedness
$137,000
Total Assets
$884,921
Total Liabilities
137,000
NET WORTH
$747,921
Fire and Tornado Insurance on Buildings
$200,000
Fire Insurance on Personal Property
75,000
The Bank understood that these financial statements were prepared under the assumption that all of Mr. Ripson's cattle were to be transferred in August of 1972 in exchange for 170,233 shares of stock to be held by Mr. and Mrs. Ripson. Only 96,476 shares were actually exchanged for the cattle. The exchange occurred January 2, 1973 and the shares were issued in Mr. Ripson's name only. The Bank re-evaluates its customers' financial status at least once annually. In September of 1973 Mr. Ripson filed the following financial statement: ASSETS
554,973 Shares of Ripson Farms, Inc. Stock with
Par Value $1 Per Share $ 554,973
1973 Cash Rent
65,000
Estimated Cash Value of Life Insurance
10,000
Cash on Hand
5,000
Total Quick Assets $ 634,973
REAL ESTATE: North Farm - Cedar County (148 Acres)
133,200
Home Farm - Cedar County (320 Acres)
288,000
Wilton Farm (Dean) - Muscatine County (140 Acres)
126,000
Wilton Farm (Raynor)-Muscatine County (80 Acres)
72,000
Thede Farm - Cedar County (200 Acres)
180,000
Total Real Estate
799,200
TOTAL ASSETS
$1,434,173
*143 LIABILITIES
Long-term Liabilities on Real Estate: North Farm (148 Acres), Thede Farm (200 Acres)--
Phoenix Mutual $ 67,000
Equitable Life, Mortgage (80 Acres and 140 Acres
65,000
Total Indebtedness
$ 132,000
NET WORTH
$1,302,173
Fire and Tornado Insurance on Buildings
$ 200,000
Fire Insurance on Personal Property
75,000
In September 1973 the corporation filed the following financial statement: ASSETS
Approximate
Head of Cattle
Value
169
Supreme Feed Yard $ 95,908
268
Supreme Feed Yard
127,217
230
Supreme Feed Yard
119,904
222
Supreme Feed Yard
108,600
179
Supreme Feed Yard
98,502
115
Supreme Feed Yard
59,530
145
Supreme Feed Yard
58,929
168
Supreme Feed Yard
59,842
82 Steers
Miller Feed Yard
41,408
146 Steers
Miller Feed Yard
74,188
237 Steers
Miller Feed Yard
95,345
112 Steers
Miller Feed Yard
46,569
162 Steers
Miller Feed Yard
94,828
124 Steers
Miller Feed Yard
69,440
19 Heifers
Danials Feed Yard
5,036
75 Heifers
Danials Feed Yard
25,599
136
Sublett Feed Yard
68,136
85
Sublett Feed Yard
38,327
209 Heifers
Truax Pasture
88,825
15 Bulls
Truax Pasture
9,000
Total Value
$1,385,127
Ripson & House
168 Steers
Miller Feed Yard
90,629
139 Steers
Miller Feed Yard
72,133
199 Steers
Miller Feed Yard
103,267
157 Steers
Miller Feed Yard
87,993
83 Steers
Miller Feed Yard
33,525
100 Heifers
Danials Feed Yard
37,842
115 Heifers
Danials Feed Yard
49,335
246
Supreme Feed Yard
120,210
120
Supreme Feed Yard
54,662
228
Supreme Feed Yard
126,882
98
Ferno
25,200
163
Meiner
52,000
Total Value of Ripson & House
853,678
Ripson Farms, Inc. One-Half
426,839
Ripson & Shaffer
154
Supreme Feed Yard
90,398
206
Supreme Feed Yard
118,553
143
Supreme Feed Yard
93,247
216
Miller Feed Yard
138,102
Total Value of Ripson & Shaffer
440,300
Ripson Farms, Inc. One-half
220,150
Ripson & Ripson
151
Danials Feed Yard
102,343
Ripson Farms, Inc. One-half
51,171
Other Cattle and Down Payments
356,807
TOTAL ASSETS
$2,440,094
*144 LIABILITIES
Liberty Trust & Savings Bank, Durant, Iowa
$1,147,555
First Trust & Savings Bank, Wheatland, Iowa
60,000
Accumulated Feed Costs & Other Debts
677,566
TOTAL LIABILITIES
1,885,121
Total Assets
$2,440,084
Total Liabilities
1,885,121
CORPORATE NET WORTH
554,973
The economic situation that arose in the cattle feeding business in late 1973 was unprecedented. Because of a sudden drop in the price of cattle, almost everyone in the business lost money. No one in the cattle business had foreseen this situation occurring. In late 1973, officers of the commercial feedlots informed Mr. Ripson that they would require the feeding costs of the cattle to be paid directly to the feedlot by the purchaser of the cattle from the sales proceeds. Mr. Ripson preferred to pay the feed bills with a corporate check. He considered this method better for record keeping purposes. To accommodate Mr. Ripson, the Bank worked out an arrangement with the banks from which the commercial feedlot operators had borrowed funds to purchase feed. The Bank guaranteed the corporate checks given by Mr. Ripson for feed bill payments by the corporation and the *145 feedlot operators transferred the entire sales proceeds to the corporation upon sale of the cattle. Beginning in November 1973, the amount received by the corporation from sale of cattle was insufficient to cover both the feed payment checks and the notes for the purchase price of the cattle. When cattle were sold in late November 1973, and the entire purchase price turned over to the Bank, there still remained an unpaid balance on the note. The Bank was unwilling to carry this unsecured corporate loan. An agreement was reached between Mr. Ripson and the Bank, whereby a mortgage on Mr. Ripson's home farm of 320 acres was to be taken to secure the feed and cattle loans following sale of the cattle. Pending the working out of the details of the mortgage loan, Mr. and Mrs. Ripson, at the insistence of the Bank, agreed to give their personal notes for the unpaid balance of the corporate notes. These personal notes were to be paid by the proceeds of the mortgage loan when the details of the mortgage loan were completed. Until November, 1973, the corporation had paid back its loans from the Bank without resort to Mr. or Mrs. Ripson. On January 28, 1974, the deed of trust for the *146 mortgage was signed and the $130,000 proceeds were used to pay off the following interim personal notes of Mr. and Mrs. Ripson: $10,000
January 25, 1974
$50,000
December 11, 1973
$65,000
November 27, 1973
The remaining $5,000 was credited to the corporation's account and Mr. Ripson paid by check the interest due on the three loans. The corporation continued doing business in 1974 until liquidation which followed sometime after Mr. Ripson's death on April 2, 1974. The corporation never repaid the $130,000 to Mr. Ripson, his estate or Mrs. Ripson. [8] Additional claims against Mr. Ripson's estate because of his cattle feeding operations were filed in 1974 for a total of $677,569.21. The payment of these claims was worked out in 1974 when Dean Ripson agreed to pay off the claims by borrowing the necessary money. [9]
*147 The corporation for the taxable year 1973 reported income of $1,914. For 1974, the corporation reported a loss of $743,650. The loss arose from cattle purchased for $2,397,102 and sole for $3,242,491 in 1974. The cattle feed purchased in that year cost $1,474,367. Mr. Ripson's estate and Mrs. Ripson on their Federal incme tax return for 1974 reported a rental income loss of $83,127. From two rental properties they reported total rent of $63,490 and $4,301 with a depreciation deduction of $8,366 for the first. Under "Other Expense" for the first property they claimed $140,092 and for the second $2,460. On Form 4831, Additional Rental Income Information, an explanation of the $140,092 claimed "Other Expense" is given. The $130,000 payment of corporate debts by Mr. and Mrs. Ripson was included in that amount as a business bad debt. Respondent in his notice of deficiency disallowed the $130,000 bad debt deduction with the following explanation: The deduction of $130,000.00 shown on your return as a business bad debt resulting from transfers of that amount to the Ripson Farms, Inc., is disallowed. The funds transferred were contributions to capital instead of loans. If, *148 however, it is found that these transfers were loans, the debt was a nonbusiness bad debt because it was a personal loan and not created in connection with your trade or business. In the latter event, the loss is subject to the limitations of section 1211 of the Internal Revenue Code. OPINION Respondent initially contends that the payments by Mr. and Mrs. Ripson on their guarantee of the indebtedness of the corporation were in substance a contribution to capital of the corporation. We have recognized that the fact that advances to a corporation are in the form of a guarantee of a corporate debt which the shareholder pays does not require a conclusion that the advance is not in substance a contribution to capital, rather than a loan. The substance of the transaction is a fact question to be determined under traditional debtequity principles. See Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 550 (1968). [10]
*149 Respondent takes the position that, because there is no showing of an adequate ratio of equity to debt of the corporation at the time the Bank guaranteed the corporate check for payment of feed, the amount of the corporate loan guaranteed by the Ripsons for this purpose was a contribution to capital. Petitioners contend that the debt-equity ratio of the corporation at the time of the Ripsons' signing of the guarantee was adequate and that the fact that declining cattle prices changed this at a later time is immaterial. While the corporate debt-equity ratio is discussed and considered in the many cases dealing with whether an advance is a loan or a contribution to capital, it is because this fact is usually indicative of the substance of the transaction. The corporate debt-equity ratio at the time the stockholder commits himself to make a specific loan can be indicative of the substance of the advance. The debt-equity ratio at other times may be relevant depending on all the surrounding facts and circumstances of the case. When Mr. and Mrs. Ripson gave their loan guarantee to the Bank *150 at the time the corporation was organized, no actual debt of the corporation was outstanding. In fact as an officer of the Bank testified, at that time the guarantee was merely an arrangement which the Bank requires of all closely held corporations. It was expected that loans made for the purchase of cattle would be adequately protected by the chattel mortgage on the cattle. No one foresaw the drastic drop in cattle prices which would occur in late 1973. There was no precedent for such a drop in so short a time. The actual guarantee of the corporate loans by the Ripsons occurred when feeder cattle were purchased and the corporation borrowed the funds for the purchase.At that time, Mr. Ripson as the president of the corporation committed the corporation to borrow, and himself to guarantee, the purchase price of the cattle. As the cattle were fed, the corporation incurred the cost of the feed. Technically this cost was not a part of the loan guaranteed by the Ripsons, but it was as a practical matter. The feedlot had a lien on the cattle for the feed superior to the Bank's chattel mortgage, in effect reducing the corporate security for the loan. Feeding the cattle, however, was *151 a part of the undertaking when the cattle were purchased and put on the feedlots.The relevant fact in determining the natural of the loan guarantee is the financial condition of the corporation when the feeder cattle were purchased and the actual loan which was guaranteed was made. The record shows that feeder cattle were purchased and therefore the loans for their purchase, which were guaranteed by the Ripsons, were taken out at least four months before the cattle were fattened and ready for the market and repayment of the loan due. This means that the three loans on which the corporation in part defaulted, which are here involved, would have been taken out prior to or during September. The corporate financial statement as of September 1, 1973, showed that the corporation had $2,440,094 in assets securing $1,885,171 of debt. Additionally, a representative of the Bank testified that the corporation was considered financially solid by the Bank until the fall of 1973. The first loan, which was not repaid in full by the corporation from the proceeds of the cattle sale, became due on November 27, 1973 (a $65,000 deficiency) and the second such loan on December 11, 1973 (a $50,000 *152 deficiency). When selling the cattle did not provide enough money to pay the feed bills and cover the loan for the purchase of those cattle, the Ripsons under their guarantee gave their personal notes for the deficit. The Bank refused to carry the corporation's unpaid cattle notes and required the Ripsons' personal notes which it was agreed were to be paid with the proceeds of a mortgage loan as soon as feasible. In the summer of 1973, when the corporation borrowed the money for purchase of the cattle and began incurring the feed costs necessitated by such purchase, the corporation was not thinly capitalized. The capital condition of the corporation in the middle or latter part of September is not clear from the record. The loan which became due on January 25, 1974, with a deficit of $10,000 would have been taken out in mid or late September. On the basis of the record as a whole, we conclude that the corporation was in a sound financial situation in late September of 1973. Therefore, in substance as well as in form, the moneys borrowed by the corporation and guaranteed by Mr. and Mrs. Ripson were loans and not capital contributions. When the Ripsons paid the personal notes *153 they gave for the deficit with the proceeds of a mortgage loan in 1974, they paid the corporate notes as guarantors. Respondent cites numerous cases in which we have held that an advance in the form of a loan to a corporation was in substance a contribution to capital and two such cases involving a stockholder's guarantee of a corporate loan. No purpose would be served in discussing these cases since each of them is factually distinguishable from the instant case. The issue here is one of fact and considering all the facts and circumstances of this case in light of the traditional debt-equity principles, we hold that the form as well as the substance of the loans and guarantee created a bona fide debt for Federal income tax purposes which upon default by the corporation and payment by the Ripsons with proceeds of a mortgage loan on the home place farm became by subrogation a debt of the corporation to the Ripsons. Putnam v. Commissioner,352 U.S. 82 (1956). See also Santa Anita Consolidated, Inc. v. Commissioner,supra.
The $130,000 debt of the corporation to the Ripsons which arose by the payment by the Ripsons of the corporate loan *154 under their guarantee with proceeds of a mortgage loan on their home place farm, was totally worthless in 1974 when its payment was made. Respondent agrees with this fact, but contends that the $130,000 debt was a nonbusiness rather than a business debt. Section 166(a)(1) provides a deduction for debts which become worthless in a taxable year. Section 166(d)(1)(A), however, excepts nonbusiness debts from the provisions of section 166(a)(1). Instead, section 166(d)(1) provides that a nonbusiness bad debt when worthless is treated as a loss from the sale or exchange of a capital asset held for not more than six months. Section 1.166-5(b), Income Tax Regs., provides that the determination of whether a debt is a nonbusiness debt is a factual determination to be made by considering the relation which the debt which becomes worthless bears to the trade or business of the taxpayer. If there is a proximate relationship of the debt to the taxpayer's trade or business, the debt is a business debt. [11] Otherwise it is a nonbusiness debt. To determine whether a debt *155 is a business or nonbusiness debt, it is necessary to look to the motivation of the lender or guarantor in making or guaranteeing the loan. *156 In United States v. Generes,405 U.S. 93, 103 (1972), the Supreme Court stated the requirement for a proximate relationship of a debt to a taxpayer's business to exist as follows: * * * in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * * In the Generes case, the Supreme Court pointed out that the dominant-motivation test tends to distinguish between business and nonbusiness bad debts while the significant-motivation test tends to obliterate the distinction. The significant-motivation test would tend to undermine the principles of Whipple v. Commissioner,373 U.S. 193 (1963), wherein it was emphasized that mere activity in corporate affairs by a shareholder did not result in a trade or business of the shareholder. It was noted that often both investment and salary protection motives were significant motivations for loans *157 by a shareholder-officer to a corporation. The Supreme Court concluded that the dominant-motivation test offered a more objective, less subjective, test for the fact finder in deciding the issue. The dominant-motive test strengthens and is consistent with section 262 which denies deductions for personal expenses. Such a test provides consistency in the interpretation of sections 165 and 166. [12]
Petitioners argue that the dominant motive of Mr. and Mrs. Ripson in guaranteeing the corporate debts was protection of salaries which could be paid by the corporation to Mr. and Mrs. Ripson.[13] Petitioners explained their position on brief as follows: *158 The taxpayers' principal source of income was the cattle feeding business, and the guaranty was necessary together with other guaranties of this business in order to protect and enhance this source of income. Without the guaranty, the Bank would have refused to finance the Corporation, and the Corporation would have been vitiated as a business entity. As we have already seen, the existence of the Corporation was very important to Mr. Ripson - and not as an investment vehicle. First of all, the Corporation would provide a salary to Mr. Ripson for his services to the Corporation, and a salary could have been paid to Mr. Ripson as an officer, director and employee of the Corporation. Second, the Corporation shielded other assets of the taxpayers from the risks of the cattle business. There is no substantial evidence to support petitioenrs' argument that a corporate salary for either Mr. or Mrs. Ripson was even one of the motives for their guaranteeing its loans and certainly nothing in the record even indicating that it was a dominant motive. There is no testimony that the payment of a salary to either of the Ripsons was one of the reasons for incorporating the business. Rather, *159 the testimony is that the business was incorporated for other reasons. The guarantee of the loans was shown to be required by the Bank in order for the corporation to buy its feeder cattle with funds borrowed from the Bank. However, this fact in no way shows that the loans were guaranteed to protect salaries from rather than investment in the corporation. Mr. Ripson was not living at the time of the trial. Mrs. Ripson testified. She did not testify that a corporate salary for her was ever even discussed or that there was any discussion of the salary, if any, Mr. Ripson would draw from the corporation. She testified that she understood that the reason for incorporating was so that an interest in the cattle feeding business could be given or left to their grandchildren. The facts show that Mr. Ripson was paid no salary by the corporation. The corporation paid Mr. Ripson $6,500 in commissions for the taxable year 1973 and nothing in 1974. The corporation made no salary or other payment for services to Mrs. Ripson in either year. Mr. and Mrs. Ripson were receiving some $60,000 a year from their son for rental of their farm property which had formerly been used by partnership *160 in its business. Although petitioners did not enter their 1973 personal income tax return in the record, it is clear that beginning in 1973 their main source of income was not employment by the cattle feeding corporation but renting the farm. Petitioners on brief also argue that the corporation was formed to shield Mr. and Mrs. Ripson's assets outside the cattle feeding business from the risks of that business. [14] If this were the dominant reason for the incorporation which required the guarantee of the corporate loans, it would appear to be an investment rather than a trade or business motive. However, we need not decide this question since it is clear on this record that protection of their other assets from liability for corporate debts was not the dominant motive in the Ripsons guaranteeing the corporate loans. Mrs. Ripson and Dean Ripson both testified Mr. Ripson's primary reason for incorporating was to give or leave to his grandchildren an interest in the cattle feeding business at as small a tax cost as possible. Also, the facts show that Mr. Ripson was aware that incorporating his sole proprietorship cattle feeding business would not furnish protection from liability *161 for loans made by the corporation from the Bank since he would have to personally guarantee those loans. If protection from personal liability was any part of the motive for incorporating, it was not a significant motive. [15]
Under the test set forth in Generes, it is clear that the dominant motive of Mr. and Mrs. Ripson was not the protection of one or both of their salaries or protection of their personal *162 assets from liabilities of the business.In fact, neither of these was even a significant factor in their guaranteeing the corporate debts. The primary reason for incorporating the business and as a consequence being required to guarantee its loans was to be able to give or leave an interest in the business to their grandchildren. This is an investment motive. Petitioners rely on Smith v. Commissioner,60 T.C. 316 (1973), wherein we found that loans to the taxpayer's corporation prior to its ceasing business in 1966 were nonbusiness loans and that those advances to the corporation after business ceased were business loans made to protect the taxpayer's credit rating for bonding purposes in his construction business. In the instant case, the loans guaranteed were made prior to the corporation's ceasing business and their is no evidence indicating that the protection of Mr. and Mrs. Ripson's credit rating was a reason for guaranteeing the loans. Petitioners rely on a number of Memorandum Opinions of this Court in which, under facts materially different from those involved in the instant case, we held a taxpayer made a loan to a corporation or guaranteed a corporate *163 loan to protect his salary or secure business in his professional capacity. These cases are all distinguishable from the instant case on their facts. The issue here is basically a facutal issue and considering all the facts and circumstances of this case, we find that the debts owed by the corporation to Mr. and Mrs. Ripson were nonbusiness debts under section 166(d)(1). Decision will be entered for the respondent.
Footnotes
1. Commercial feedlots located in other states were used through the years for Mr. Ripson's cattle feeding operations, because of the limited space available on his home farms and because of the harsh winters in Iowa.↩
2. The partnership in 1968 reported income of $18,302. The partnership in 1970 reported income of $17,355. This income included profit from cattle costing $2,168,265 and selling for $2,654,354. The cattle feed purchased in that year cost around $290,000. The partnership in 1971 reported income of $61,954. This income included profit from cattle costing $1,104,405 and selling for $1,565,935. The cattle feed purchased in that year cost around $300,000. The partnership in 1972 reported income of $60,548. This income included profit from cattle costing $79,144 and selling for $86,050. The cattle feed purchased in that year cost around $1,000. For the remainder of 1972, Mr. Ripson ran the cattle feeding operation as a sole proprietor.His 1972 income from farming was reported as $61,870. This income included profit from cattle costing $3,699,221 and selling for $4,584,065. The cattle feed purchased in that year cost around $625,000. Not included in Mr. Ripson's income for 1972 was the payment received for the rent of the farm property by Dean Ripson. It appears that the actual payment did not occur until 1973, a year for which no tax return was placed into evidence.↩
3. For a number of years prior to his death in 1974, Mr. Ripson's health had been failing. He suffered from a deteriorating hip condition which was quite painful.↩
4. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue.↩
5. Mrs. Ripson signed simply because her husband asked her to do so. ↩
6. Prior to guaranteeing the corporate debts with the Bank, Mrs. Ripson had guaranteed Mr. Ripson's debts first to the limited extent of $500,000 on October 9, 1971 and without limit on May 19, 1972, thus, subjecting their jointly-owned property, as well as Mrs. Ripson's property, to such debts as Mr. Ripson might incur. Mr. Ripson and Mrs. Ripson had guaranteed their son's debts with the Bank up to $150,000 on October 20, 1971.↩
7. Under the law of Kansas, where most of the corporate cattle were fed, the commercial feedlot had a first priority lien on the cattle for the price of feed.↩
8. Mr. and Mrs. Ripson were subrogated to the rights of the Bank against the corporation under Iowa Code↩ § 554.3415(5) (1971). 9. One claim against the corporation was not maintained against the estate since there was no personal guaranty involved. Often Mr. Ripson and after the formation of the corporation, Mr. Ripson acting for the corporation would contract to purchase feeder cattle several months before the feeder cattle were to be purchased. There was outstanding at the time of Mr. Ripson's death a contract of the corporation to purchase feeder cattle at a price higher than the then selling price of such cattle. When it came time to fulfill that contract, the corporation was without funds. Dean Ripson and the seller of the cattle settled the question for a relatively small sum. In this one instance the corporate form acted to protect the assets of Mr. Ripson's estate outside the corporation.↩
10. See also sec. 1.166-1(c), Income Tax Regs., which provides: (c) Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. The fact that a bad debt is not due at the time of deduction shall not of itself prevent its allowance under section 166↩. * * *
11. Sec. 1.166-5 [Income Tax Regs.] Nonbusiness debts. * * * (b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than-- (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. The use to which the borrowed funds are put by the debtor is of no consequence in making a determination under this paragraph. For purposes of section 166 and this section, a nonbusiness debt does not include a debt described in section 165(g)(2)(C)↩. See sec. 1.165-5, relating to losses on worthless securities.
12. In his concurrence, Justice Marshall, agreeing with the majority, reviewed the legislative history of the bad debt deduction provisions to find support for the decision. United States v. Generes,405 U.S. 93, 107-112↩ (1972).
13. Petitioners also argue that their dominant motive was to further their trade or business of guaranteeing loans. This argument contradicts the employee-salary argument and in any event is completely unfounded on the record before us. Although an exact definition of a trade or business is not found in the Internal Revenue Code, the Income Tax Regs. or case law, petitioners were plainly not in the trade or business of guaranteeing loans. They made the guarantees of the corporate debts, each other's debts and their son's debts without expectation of profit. In fact, if the corporation needed to take advantage of their guarantee, because of insufficient funds to pay its own debts, the guarantee probably would create a loss. Guaranteeing the corporate loans was a no win proposition if viewed as part of a trade or business of guaranteeing loans; only if viewed as a necessary step in the incorporation of the cattle feeding operation does the guarantee of the corporate loans make sense from a business viewpoint. Cf. Whipple v. Commissioner,373 U.S. 193↩ (1963).
14. On reply brief, petitioners reverse fields and argue that why the corporation was formed is not a relevant inquiry in determining the motives of Mr. and Mrs. Ripson in guaranteeing the loans. As petitioners note on brief, the reason the motives for incorporation are important is that without the guarantee there could have been no corporation. And, the desire to operate in the corporate form was the reason the guarantees were signed by Mr. and Mrs. Ripson. Therefore, the motives behind incorporation are relevant in this case. ↩
15. The record shows that there was a protection of personal assets found in the isolated instance testified about by petitioners' attorney, who set up the corporation. The value of the savings from the broken cattle contract is not shown.↩